[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13005

_____

DONALD J. TRUMP,

Plaintiff-Appellee,

*versus*

UNITED STATES OF AMERICA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:22-cv-81294-AMC

_____

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

PER CURIAM:

Following the execution of a search warrant at the residence of Plaintiff-Appellee, former President Donald J. Trump, Plaintiff moved for the appointment of a special master to review the documents that Defendant-Appellant United States of America seized. The district court granted that motion in substantial part. Now, the United States moves for a partial stay of the district court's order as it relates to the roughly one-hundred documents bearing classification markings. We decide only the narrow question presented: whether the United States has established that it is entitled to a stay of the district court's order, to the extent that it (1) requires the government to submit for the special master's review the documents with classification markings and (2) enjoins the United States from using that subset of documents in a criminal investigation. We conclude that it has.

We stress the limited nature of our review: this matter comes to us on a motion for a partial stay pending appeal. We cannot (and do not) decide the merits of this case. We decide only the traditional equitable considerations, including whether the United States has shown a substantial likelihood of prevailing on the merits, the harm each party might suffer from a stay, and where the public interest lies.

For the reasons we explain below, we grant the United States's motion for a partial stay pending appeal.

# I.  BACKGROUND

*A.    Factual Background*

Plaintiff left the White House in January 2021, after serving as President of the United States.  Upon leaving office, movers transferred boxes of documents to his personal residence in southern Florida.  Doc. No. 1 at 4.

The record reveals that, throughout 2021 (and consistent with its responsibilities under the Presidential Records Act, 44 U.S.C. §§ 2201–09), the National Archives and Records Administration sought to obtain records in Plaintiff's possession.  Doc. No. 48-1 at 2, 6.

In response to these requests, in January 2022, Plaintiff transferred fifteen boxes of documents to the National Archives.  *Id.*  The National Archives reviewed the contents of the boxes and found inside "newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes" but also "presidential correspondence, personal and post-presidential records, and a lot of classified records."  Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize ¶ 24, *In re Sealed Search Warrant*, No. 22-MJ-8332 (S.D. Fla. Sept. 12, 2022) ("Warrant Affidavit") (quotation omitted).  Consequently, the National Archives sent a referral by email to the Department of Justice on February 9, 2022.  *Id.*

Upon learning about the classified materials, the Department sought access to the fifteen boxes in part "so that the FBI and others in the Intelligence Community could examine them." Doc. No. 48-1 at 6. The National Archives responded by advising Plaintiff, on April 12, 2022, that it intended to provide the FBI access to the records the week of April 18, 2022. *Id.* at 7. When Plaintiff requested an extension of the production date to April 29, 2022, the National Archives held off on sending the documents to the FBI. *Id.*

On that date, Plaintiff asked for another extension of time and informed the National Archives that, if it declined to grant the extension, he would make a protective assertion of executive privilege over the documents. Doc. No. 48 at 6. On May 10, the National Archives informed Plaintiff's representatives that it had decided not to honor Plaintiff's protective claim of executive privilege, and that it would provide the FBI access to the records as early as May 12, 2022. *Id.* at 9. That letter noted that President Biden had deferred to the National Archives's determination that executive privilege did not apply. *Id.* at 7. Despite this advance warning, Plaintiff made no effort to block the FBI's access to the documents at that time. Doc. No. 48 at 6–7.

During a preliminary review of the documents between May 16–18, 2022, the FBI found 184 documents marked at varying levels of classification (including twenty-five documents marked top secret). *Id.* at 7; Warrant Affidavit ¶ 47.

The FBI also developed evidence that more boxes containing classified information remained at Plaintiff's residence. Doc. No. 48 at 7. The Department obtained a grand-jury subpoena directed to Plaintiff's custodian of records, and requested all documents or writings in Plaintiff's custody or control bearing classification markings. Doc. No. 48 at 7–8. Plaintiff's counsel was served with the subpoena on May 11, 2022. *Id.* at 8.

Plaintiff sought (and received) an extension of time to produce the subpoenaed documents. *Id.* After initially denying the request, the government extended the compliance deadline until June 7, 2022. *Id.* On June 3, 2022, in response to the subpoena, Plaintiff's representatives produced an envelope containing thirty-eight such documents. Warrant Affidavit ¶ 58. At the same time, his representative stated that she was authorized to certify that a "diligent search was conducted" and that "[a]ny and all responsive documents" accompanied the certification. Doc. No. 48 at 9. The envelope contained classified documents, including seventeen marked top secret, and was double-wrapped in tape, consistent with handling procedures for classified documents. Warrant Affidavit ¶¶ 58, 60. Plaintiff made no claims of privilege with his production in response to the subpoena. Doc. No. 48 at 8.

Despite Plaintiff's production in response to the subpoena and counsel's representation that a diligent search had occurred and all responsive documents had been produced, the FBI developed evidence that more classified documents remained at Plaintiff's residence. *Id.* at 10. In August 2022 the Department, through

an FBI agent's sworn affidavit, informed a magistrate judge of the evidence it had developed, and the magistrate judge agreed that probable cause existed that evidence of possible violations of the law would be found in Plaintiff's residence. *Id.* at 11; *see also* Warrant Affidavit at 1, 32. Based on this evidence, the magistrate judge issued a search warrant for Plaintiff's residence. When the FBI executed the search warrant, it seized thirty-three items of evidence (mostly boxes) containing approximately 11,000 documents and 1,800 other items. Doc. No. 48 at 4, 12–13. Among the boxes, thirteen contained documents with classification markings, and three classified documents were found in Plaintiff's desks. All told, the search uncovered over one-hundred documents marked confidential, secret, or top secret. *Id.* at 13.

In accordance with the protocol that the magistrate judge had approved in the search warrant, the Department directed a "Privilege Review Team"—composed of agents not otherwise participating in the investigation—to review certain seized documents for attorney-client privilege. Doc. No. 48 at 14; *see* Warrant Affidavit ¶¶ 81–84.

Based on its review, the Privilege Review Team identified (and segregated) an initial subset of about 520 pages (not documents) that might contain privileged material. Doc. No. 64 at 14. Within the remaining documents, members of the investigative team found at least two instances of potentially privileged material, which they delivered to the Privilege Review Team. *Id.* at 15.

B.    *Procedural History*

Two weeks after the execution of the search warrant, Plaintiff filed a motion in the district court asking for it to (1) appoint a special master, (2) enjoin further review of the seized materials until a special master was appointed, (3) require the United States to supply a more detailed Receipt for Property, and (4) require the United States to return any item seized that was not within the scope of the search warrant.  Doc. No. 28 at 10.

Regarding jurisdiction, among other bases, Plaintiff asserted that the district court could appoint a special master under its "supervisory authority" and its "inherent power" and could enjoin the government's review under its "equitable jurisdiction."  Doc. No. 28 at 5–6.

The United States made three primary arguments in opposition.  *First*, the United States argued that Plaintiff lacked Fourth Amendment "standing" to seek relief because he did not have a possessory interest in the seized property.  In support of this position, the United States asserted that the seized records were Presidential records, which properly belonged to the people of the United States, not to Plaintiff.

*Second*, as to the appointment of a special master, the United States contended that (1) appointment of a special master was the exception, not the rule; (2) a special master was neither necessary nor appropriate to address whether certain documents were subject to executive privilege because Plaintiff could not

assert executive privilege against the Executive Branch; (3) even if he could, the privilege would yield to the United States's need to investigate a possible crime and the United States's compelling interest in sensitive and highly classified documents; (4) appointment of a special master would be inconsistent with equitable principles given that Plaintiff had not, as required, turned the records over to Archives in the first instance; and (5) the case did not involve complex or voluminous records, so a privilege filter team was appropriate.

*Third*, as to injunctive relief, the United States argued that (1) Plaintiff had waited too long to seek relief, and the Department's review of the documents, which Plaintiff sought to avoid, had already occurred; (2) Plaintiff was not likely to succeed on the merits of his claims of executive privilege because he did not have any cognizable claim of executive privilege over the documents; and (3) the harm to the United States—in the delay in its investigation—far outweighed any injury to Plaintiff because of the risk to national security.

Plaintiff replied that he had Fourth Amendment standing because the characterization of the documents (whether personal or Presidential records) went to the merits of his claim—not his standing to raise it. While Plaintiff appears to view appointment of a special master as a predicate to filing a motion under Rule 41(g) (which allows a person to seek return of seized items), he disclaimed reliance on that Rule for the time being, saying that he "h[ad] not yet filed a Rule 41(g) motion, and [so] the standard for

relief under that rule [wa]s not relevant to the issue of whether the Court should appoint a Special Master." Doc. No. 58 at 6.

The district court granted Plaintiff's motion in part. As to jurisdiction, the district court first concluded that it enjoyed equitable jurisdiction because Plaintiff had sought the return of his property under Rule 41(g), which created a suit in equity.[1] Because its jurisdiction was equitable, the district court explained, it turned to the *Richey* factors to decide whether to exercise equitable jurisdiction.[2]

For the first *Richey* factor—callous disregard for Plaintiff's constitutional rights—the district court found no evidence that the

---

[1] As we have noted, Plaintiff disclaimed having already filed a Rule 41(g) motion in his initial reply to the government. Doc. No. 58 at 6. Yet in the same filing, Plaintiff stated that he "intends" to assert that records were seized in violation of the Fourth Amendment and the Presidential Records Act and are "thus subject to return" under Rule 41(g). *Id.* at 8; *see also id.* at 18 ("Rule 41 exists for a reason, and the Movant respectfully asks that this Court ensure enough fairness and transparency, even if accompanied by sealing orders, to allow Movant to legitimately and fulsomely investigate and pursue relief under that Rule."). The district court resolved this situation by classifying Plaintiff's initial filing as a "hybrid motion" that seeks "ultimately the return of the seized property under Rule 41(g)." Doc. No. 64 at 6–7.

[2] *Richey v. Smith*, 515 F.2d 1239, 1243–44 (5th Cir. 1975) (outlining the standard for entertaining a pre-indictment motion for the return of property under Rule 41(g)). Because the Fifth Circuit issued this decision before the close of business on September 30, 1981, it is binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

United States had engaged in that type of behavior. As to the second factor—Plaintiff's interest in and need for the seized property—the district court determined that Plaintiff had an interest in at least some of the documents, like his medical documents, tax correspondence, and accounting information. But it made no finding that Plaintiff had a need for the classified documents. The third factor, the district court reasoned, weighed in favor of exercising jurisdiction because, in its view, Plaintiff suffered a likelihood of irreparable injury in the form of improper disclosure of sensitive information to the public and the threat of future prosecution and the associated stigma. Finally, the district court concluded that Plaintiff had no alternative remedy at law because otherwise, the United States might just retain the property indefinitely. Based on the four *Richey* factors, the district court agreed to exercise equitable jurisdiction.

Next, the district court held that Plaintiff had Fourth Amendment standing to seek a special master because he potentially had a possessory interest in the records. The district court reached this determination because, the court said, it was still undetermined whether the seized records were personal or Presidential.

On the merits, the district court deemed a special master warranted, given that (1) the United States had found at least two instances in which the Privilege Review Team reported that members of the investigative team had been exposed to privileged material, and (2) a special master might be perceived to be more

impartial than the Privilege Review Team.  As to executive privilege, the district court posited that Plaintiff might be able to assert executive privilege against the current President.  And, the court continued, the fact that the Privilege Review Team hadn't screened for executive privilege further militated towards appointment of a special master.

Finally, the district court enjoined the United States from further review and use of the seized materials for criminal investigative purposes—but allowed it to review and use the materials for the "purposes of intelligence classification and national security assessments."

After the district court issued its order, the United States moved for a partial stay of that order pending appeal as to the limited set of documents (just over one hundred) that were marked as classified.  The United States argued that (1) Plaintiff did not have a possessory interest in the classified documents (because they belonged to the United States, not to him); (2) such documents could not possibly contain attorney-client privileged information; and (3) even if Plaintiff could exert executive privilege over some of the records, that privilege would be overcome by the United States's demonstrated, specific need to review the classified documents to see if and how much of a risk to national security existed.

As to executive privilege, the United States noted, Plaintiff had not asserted executive privilege in response to the May subpoena; instead, he had produced documents and his custodian had certified that he had produced all responsive documents, which

meant that he could not assert executive privilege over documents that he was supposed to have already produced (but did not). The United States argued that it needed a stay of the district court's injunction against the criminal investigation; the criminal investigation and national security were intertwined, the government emphasized, so the district court's order prevented the United States from effectively reviewing the documents for national-security risk.

In support of that position, the United States attached a declaration from Alan E. Kohler, Jr., the Assistant Director of the Counterintelligence Division of the FBI. Kohler's declaration explained that "since the 9/11 attacks, the FBI has integrated its intelligence and law enforcement functions when it exercises its national security mission." Declaration of Alan E. Kohler, Jr., Asst. Dir., Counterintelligence Div., FBI ("Kohler Decl."), Doc. No. 69-1 ¶ 8. Kohler explained that, as part of a classification review to assess the existence and extent of damage to the national-security interests of the United States from disclosure of the documents marked classified, the FBI needed to access evidence and disseminate it to other intelligence agencies to assess potential harm. *See id.* ¶ 7. Those assessments, Kohler continued, would "necessarily" inform the FBI's criminal investigation. *Id.* ¶ 9. For example, if an Intelligence agency were to obtain intelligence indicating that a classified document in the seized materials might have been compromised, the FBI would be responsible for taking some of the necessary steps to evaluate that risk. *Id.* Plus, Kohler attested, "the

FBI is the only [Intelligence Community] element with a full suite of authorities and tools to investigate and recover any improperly retained and stored classified information in the United States." *Id.*

Not only that, but as a practical matter, Kohler explained, "the same senior [Department of Justice] and FBI officials, such as [Kohler], are ultimately responsible for supervising the criminal investigation and for ensuring that the FBI is coordinating appropriately with the rest of the [Intelligence Community] on its classification review and assessment." *Id.* ¶ 10.

Plaintiff responded that "there still remains a disagreement as to the classification status of the documents." He emphasized that special-master review was temporary and asserted that he had a statutory right to access the documents.

On September 15, the district court denied a stay pending appeal and appointed a special master. Doc. No. 89. In explaining the basis for its decision, the district court first reasoned that it was not prepared to accept, without further review by a special master, that "approximately 100 documents isolated by the Government . . . [were] classified government records." Doc. No. 89 at 3. Second, the district court declined to accept the United States's argument that it was impossible that Plaintiff could assert a privilege for some of the documents bearing classification markings. Doc. No. 89 at 3–4.

The next day, the United States moved in this Court for a partial stay pending appeal, seeking to stay the district court's

orders with respect to only the roughly one-hundred documents bearing classification marks. Based on the United States's contention that these documents and the corresponding criminal investigation are "essential to the government's effort to identify and mitigate potential national-security risks," the United States asked this Court to "act on [its] motion as soon as practicable."

We directed Plaintiff to file an expedited response to the United States's motion for partial stay. Plaintiff responded that (1) we lack jurisdiction over the order appointing a special master; (2) he has Rule 41(g) standing; (3) that the United States has not proved that the documents that are marked "classified" are actually "classified"; and (4) the district court properly balanced the harms in enjoining the United States.

The United States replied that (1) Plaintiff's jurisdictional argument lacks merit; (2) Plaintiff lacks Rule 41(g) standing as it pertains to the classified documents; (3) The records bearing classification markings have no plausible case for being privileged, and even if Plaintiff had claimed to have declassified them, the United States would still need to assess them and (4) without a stay of the district court's order as it regards the classified documents, the government and the public will be irreparably harmed.

We have carefully reviewed the parties' briefs and the record.

## II.    JURISDICTION

We have appellate jurisdiction through 28 U.S.C. § 1292(a)(1), which provides courts of appeals with jurisdiction over interlocutory orders granting injunctions.[3] *Ala. v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005).

## III.    DISCUSSION

When deciding whether to grant a stay pending appeal, we evaluate four factors:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v.*

---

[3] Plaintiff argues that we "lack[] jurisdiction to review the special master's authority."  But our order does not address the special master's authority; it addresses the district court's orders as they require the United States to act and to refrain from acting.  Nevertheless, we note that the district court "enjoin[ed] the Government from reviewing and using the seized materials for investigative purposes pending completion of the special master's review or further Court order," "in natural conjunction with [the appointment of the special master]."  Doc. No. 64 at 1.  And our pendent jurisdiction allows us to address an otherwise nonappealable order when it is inextricably intertwined with an appealable decision, or when review of an otherwise-nonappealable order "is necessary to ensure meaningful review" of an appealable decision. *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017) (citation omitted).

*Braunskill*, 481 U.S. 770, 776 (1987)).  After considering the four factors here, we conclude that the United States is entitled to a stay.

> A.  *The United States has established a substantial likelihood of success on the merits.*

The United States argues that the district court likely erred in exercising its jurisdiction to enjoin the United States's use of the classified records in its criminal investigation and to require the United States to submit the marked classified documents to a special master for review.  We agree.

Our binding precedent states that when a person seeks return of seized property in pre-indictment cases, those actions "are governed by equitable principles, whether viewed as based on [Federal Rule of Criminal Procedure] 41[(g)] or on the general equitable jurisdiction of the federal courts."  *Richey v. Smith*, 515 F.2d 1239, 1243 (5th Cir. 1975).  Here, while Plaintiff disclaimed that his motion was for return of property as specified in Rule 41(g), he asserted that equitable jurisdiction existed.  And the district court relied on both Rule 41(g) and equitable jurisdiction in its orders.  Doc. No. 64 at 8–12.  Either way, *Richey* teaches that equitable principles control.

Whether a court should exercise its equitable jurisdiction in this context "is subject to the sound discretion of the district court."  *Richey*, 515 F.2d at 1243.  But that discretion is not boundless.  The factors a court should consider when deciding whether to exercise jurisdiction include (1) whether the government "displayed a

callous disregard for . . . constitutional rights" in seizing the items at issue; (2) "whether the plaintiff has an individual interest in and need for the material whose return he seeks;" (3) "whether the plaintiff would be irreparably injured by denial of the return of the property;" and (4) "whether the plaintiff has an adequate remedy at law for the redress of his grievance." *Id.* at 1243–44 (footnotes and quotation omitted). We consider each in turn.

We begin, as the district court did, with "callous disregard," which is the "foremost consideration" in determining whether a court should exercise its equitable jurisdiction. *United States v. Chapman*, 559 F.2d 402, 406 (5th Cir. 1977). Indeed, our precedent emphasizes the "indispensability of an accurate allegation of callous disregard." *Id.* (alteration accepted and quotation omitted).

Here, the district court concluded that Plaintiff did not show that the United States acted in callous disregard of his constitutional rights. Doc. No. 64 at 9. No party contests the district court's finding in this regard. The absence of this "indispensab[le]" factor in the *Richey* analysis is reason enough to conclude that the district court abused its discretion in exercising equitable jurisdiction here. *Chapman*, 559 F.2d at 406. But for the sake of completeness, we consider the remaining factors.

The second *Richey* factor considers "whether the plaintiff has an individual interest in and need for the material whose return he seeks." 515 F.2d at 1243. The district court concluded that Plaintiff had an interest in some of the seized material because it included "medical documents, correspondence related to taxes, and

accounting information." Doc. No. 64 at 9. But none of those concerns apply to the roughly one-hundred classified documents at issue here. And the district court made no mention in its analysis of this factor as to why or how Plaintiff might have an individual interest in or need for the classified documents.

For our part, we cannot discern why Plaintiff would have an individual interest in or need for any of the one-hundred documents with classification markings. Classified documents are marked to show they are classified, for instance, with their classification level. *Classified National Security Information*, Exec. Order No. 13,526, § 1.6, 3 C.F.R. 298, 301 (2009 Comp.), *reprinted in* 50 U.S.C. § 3161 app. at 290–301. They are "owned by, produced by or for, or . . . under the control of the United States Government." *Id.* § 1.1. And they include information the "unauthorized disclosure [of which] could reasonably be expected to cause identifiable or describable damage to the national security." *Id.* § 1.4. For this reason, a person may have access to classified information only if, among other requirements, he "has a need-to-know the information." *Id.* § 4.1(a)(3). This requirement pertains equally to former Presidents, unless the current administration, in its discretion, chooses to waive that requirement. *Id.* § 4.4(3).

Plaintiff has not even attempted to show that he has a need to know the information contained in the classified documents. Nor has he established that the current administration has waived that requirement for these documents. And even if he had, that, in

and of itself, would not explain why Plaintiff has an individual interest in the classified documents.

Plaintiff suggests that he may have declassified these documents when he was President. But the record contains no evidence that any of these records were declassified. And before the special master, Plaintiff resisted providing any evidence that he had declassified any of these documents. *See* Doc. No. 97 at 2–3., Sept. 19, 2022, letter from James M. Trusty, *et al.*, to Special Master Raymond J. Dearie, at 2–3. In any event, at least for these purposes, the declassification argument is a red herring because declassifying an official document would not change its content or render it personal. So even if we assumed that Plaintiff did declassify some or all of the documents, that would not explain why he has a personal interest in them.

This factor—the Plaintiff's personal interest (or lack thereof) in the documents—also weighs against exercising jurisdiction.

Third, *Richey* asks "whether the plaintiff would be irreparably injured by denial of the return of the property." 515 F.2d at 1243. The district court identified potential harm that could arise based on (1) improper disclosure of "sensitive information" to the public; (2) the United States's retention and use of privileged materials; and (3) the stigma associated with future prosecution. *See* Doc. No. 64 at 9–10.

We cannot conclude that Plaintiff would be irreparably injured by a stay regarding the documents marked classified. Plaintiff

suggests that he could be harmed by the disclosure of sensitive information. Doc. No. 84 at 8. But permitting the United States to retain the documents does not suggest that they will be released; indeed, a purpose of the United States's efforts in investigating the recovered classified documents is to *limit* unauthorized disclosure of the information they contain. Not only that, but any authorized official who makes an improper disclosure risks her own criminal liability. *See, e.g.,* 18 U.S.C. § 798. We also doubt that Plaintiff risks irreparable injury in the form of disclosure of privileged information; he has not, for example, asserted attorney-client privilege over any of the classified documents.

The remaining potential injury identified by the district court is "the threat of future prosecution and the serious, often indelible stigma associated therewith." Doc. No. 64 at 10. No doubt the threat of prosecution can weigh heavily on the mind of someone under investigation. But without diminishing the seriousness of that burden, "if the mere threat of prosecution were allowed to constitute irreparable harm . . . every potential defendant could point to the same harm and invoke the equitable powers of the district court." *United States v. Search of Law Office, Residence, and Storage Unit Alan Brown*, 341 F.3d 404, 415 (5th Cir. 2003) (quotation omitted). If this concern were sufficient to constitute irreparable harm, courts' "exercise of [their] equitable jurisdiction would not be extraordinary, but instead quite ordinary." *Id.*

"It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions." *Douglas v. City of Jeannette*, 319

U.S. 157, 163 (1943); *see also Deaver v. Seymour*, 822 F.2d 66, 71 (D.C. Cir. 1987) (Silberman, J.) (rejecting civil suit to enjoin government from indicting plaintiff and explaining that "[p]rospective defendants cannot, by bringing ancillary equitable proceedings, circumvent federal criminal procedure."); *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016) ("In almost all federal criminal prosecutions, injunctive relief . . . will not be appropriate. Federal courts traditionally have refused, except in rare instances, to enjoin federal criminal prosecutions.").[4]

In sum, the third *Richey* factor also weighs against exercising equitable jurisdiction.

Finally, *Richey* asks "whether the plaintiff has an adequate remedy at law for the redress of his grievance." 515 F.2d at 1243–44. The district court found that this factor weighed in favor of

---

[4] The Supreme Court has recognized an exception to this general rule—where "the threats to enforce the statutes against appellants are not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants." *Younger v. Harris*, 401 U.S. 37, 48 (1971) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 482 (1965)). Plaintiff has not made such an allegation here, nor do we see any evidence in the record to support one. And though *Younger* involved a state prosecution, many courts have applied the basic principles in *Younger* to federal prosecutions. *See, e.g., Deaver*, 822 F.2d at 69–70 ("[I]n no case that we have been able to discover has a federal court enjoined a federal prosecutor's investigation or presentment of an indictment. . . . Because these defendants are already guaranteed access to a federal court, it is not surprising that subjects of federal investigation have never gained injunctive relief against federal prosecutors.").

Plaintiff because otherwise, "Plaintiff would have no legal means of seeking the return of his property for the time being."  Doc. No. 64 at 10.  But Plaintiff has been clear that he is not seeking the return of the classified documents.  *See* Doc. No. 58 at 6 ("In general, the Government's argument is premature.  Movant has not yet filed a Rule 41(g) motion, and the standard for relief under that rule is not relevant to the issue of whether the Court should appoint a Special Master.").  And even if he were, he has not identified any reason that he is entitled to them.

This factor then, also weighs against exercising equitable jurisdiction.

In sum, none of the *Richey* factors favor exercising equitable jurisdiction over this case.  Consequently, the United States is substantially likely to succeed in showing that the district court abused its discretion in exercising jurisdiction over Plaintiff's motion as it concerns the classified documents.[5]

---

[5] The district court referred fleetingly to invoking its "inherent supervisory authority," though it is unclear whether it utilized this authority with respect to the orders at issue in this appeal.  Doc. No. 64 at 1, 7 n.8.  Either way, the court's exercise of its inherent authority is subject to two limits: (1) it "must be a reasonable response to the problems and needs confronting the court's fair administration of justice," and (2) it "cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute."  *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) (quotation omitted).  The district court did not explain why the exercise of its inherent authority concerning the documents with classified markings would fall within these

B. *The United States would suffer irreparable injury in the absence of a stay.*

We next consider the second *Nken* factor: whether the United States would suffer irreparable injury in the absence of a stay. *See* 556 U.S. at 426. We conclude that it would.

The motion for a partial stay distinguishes the roughly one-hundred seized records with classification markings from the remaining seized materials without any such markings. Because the classified nature of these documents bears on our analysis, we begin with a (brief) overview of the United States's system of classification.

Since World War I, the Executive Branch "has engaged in efforts to protect national security information by means of a classification system graded according to sensitivity." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988). In practice, Presidents have often used Executive Orders to "protect sensitive information and to ensure its proper classification throughout the Executive Branch." *Id.* at 528.[6] The current operative classification protocols

---

bounds, other than its reliance on its *Richey*-factor analysis. We have already explained why that analysis was in error.

[6] For its part, Congress has recognized the importance of a national security classification system and has directed that "the President shall, by Executive order or regulation, establish procedures to govern access to classified information which shall be binding upon all departments, agencies, and offices of the executive branch of Government." 50 U.S.C. § 3161.

are described in Executive Order 13,526.  Exec. Order No. 13,526, 3 C.F.R. 298.

Under Executive Order 13,526, there are three classification levels: Confidential, Secret, and Top Secret.  *Id.* § 1.2.  The standard for the level at which particular information should be classified turns on whether "the unauthorized disclosure" of the information "reasonably could be expected to cause" either "damage" (Confidential), "serious damage" (Secret), or "exceptionally grave damage" (Top Secret) to national security.  *Id.*  Once so designated, classified materials may remain classified for up to ten years, unless the original classification authority determines that the duration should be extended up to twenty-five years.  *Id.* § 1.5.

Executive Order 13,526 also sets forth how documents can be declassified.  In general, information can be declassified or downgraded by the official who authorized the original classification, her successor, her supervisor, or other officials with express declassification authority.  *Id.* § 3.1(b).  Classified records are also subject to automatic declassification if they are more than twenty-five years old and have permanent historical value, unless they fall into certain enumerated categories such that their declassification could harm national security.  *Id.* § 3.3.  For example, information that could reveal the identity of a confidential human source or that relates to weapons of mass destruction is exempted from automatic disclosure.  *See id.*

Returning to the case before us, under the terms of the district court's injunction, the Office of the Director of National

Intelligence is permitted to continue its "classification review and/or intelligence assessment" to assess "the potential risk to national security that would result from disclosure of the seized materials." Doc. No. 64 at 1–2, 6. But the United States is enjoined "from further review and use of any of the materials seized from Plaintiff's residence on August 8, 2022, for criminal investigative purposes pending resolution of the special master's review process." *Id.* 23–24.

This distinction is untenable. Through Kohler's declaration, the United States has sufficiently explained how and why its national-security review is inextricably intertwined with its criminal investigation. When matters of national security are involved, we "must accord substantial weight to an agency's affidavit." *See Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 939 F.3d 1164, 1182 (11th Cir. 2019) (quoting *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)).

The engrained principle that "courts must exercise the traditional reluctance to intrude upon the authority of the Executive in military and national security affairs" guides our review of the United States's proffered national-security concerns. *United States v. Zubaydah*, 142 S. Ct. 959, 967 (2022) (alteration and citation omitted). No party has offered anything beyond speculation to undermine the United States's representation—supported by sworn testimony—that findings from the criminal investigation may be critical to its national-security review. *See* Kohler Decl. ¶ 9. According to the United States, the criminal investigation will seek to

determine, among other things, the identity of anyone who accessed the classified materials; whether any particular classified materials were compromised; and whether additional classified materials may be unaccounted for.  As Plaintiff acknowledges, backwards-looking inquiries are the domain of the criminal investigators.  Doc. No. 84 at 15–16.  It would be difficult, if not impossible, for the United States to answer these critical questions if its criminal investigators are not permitted to review the seized classified materials.

Precisely because the United States's criminal investigation is focused on past events, Plaintiff responds that the United States is not irreparably harmed because it can be distinguished from prospective national-security review.  We are not persuaded.

The United States explains that there are circumstances where its national-security assessment of the classified materials is inextricably intertwined with the criminal investigation.  Plaintiff acknowledges that the two "may relate," but contends that any tension between these functions can be resolved because the district court's order permits national-security assessments that "truly are, in fact, inextricable from criminal investigative use of the seized materials."  But discerning when an assessment becomes "truly" inextricable is far more easily said than done.  Under that theory, officials charged with overseeing both national security and criminal investigations would risk contempt of court, undoubtedly chilling their national-security duties.  Thus, an injunction delaying (or perhaps preventing) the United States's criminal investigation

from using classified materials risks imposing real and significant harm on the United States and the public.

The United States also argues that allowing the special master and Plaintiff's counsel to examine the classified records would separately impose irreparable harm. We agree. The Supreme Court has recognized that for reasons "too obvious to call for enlarged discussion, the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Egan*, 484 U.S. at 529 (quotation omitted). As a result, courts should order review of such materials in only the most extraordinary circumstances. The record does not allow for the conclusion that this is such a circumstance.

In sum, given the long-recognized "compelling interest in protecting . . . the secrecy of information important to our national security," *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980), we conclude that the United States would suffer irreparable harm from the district court's restrictions on its access to this narrow—and potentially critical—set of materials, as well as the court's requirement that the United States submit the classified records to the special master for review.

### C. *Plaintiff has not shown that he will suffer a substantial injury as a result of the limited stay.*

We next turn to the third *Nken* factor, "whether issuance of the stay will substantially injure the other parties interested in the

proceeding." 556 U.S. at 426. Here, we analyze whether Plaintiff would be "substantially injure[d]" by a stay. Largely for reasons we have already discussed, we conclude that he would not.

*First*, as we have explained, Plaintiff does not have a possessory interest in the documents at issue, so he does not suffer a cognizable harm if the United States reviews documents he neither owns nor has a personal interest in.

*Second*, we find unpersuasive Plaintiff's insistence that he would be harmed by a criminal investigation. "Bearing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship." *Cobbledick v. United States*, 309 U.S. 323, 325 (1940).

*Third*, because of the nature of the classified materials at issue here and based on the record, we have no reason to expect that the United States's use of these records imposes the risk of disclosure to the United States of Plaintiff's privileged information.

Given the limited scope of the stay—applying to only approximately one-hundred classified documents—we conclude that Plaintiff has not shown he will be substantially injured by a stay.

### D. The public interest favors a stay.

We now come to the fourth and final *Nken* factor: "where the public interest lies." 556 U.S. at 426. The documents at issue contain information "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the

national security." Exec. Order No. 13,526, § 1.2(a)(1), 3 C.F.R. 298. It is self-evident that the public has a strong interest in ensuring that the storage of the classified records did not result in "exceptionally grave damage to the national security." Ascertaining that necessarily involves reviewing the documents, determining who had access to them and when, and deciding which (if any) sources or methods are compromised. *See* Kohler Decl. ¶¶ 6–9. For these reasons, we conclude that the public interest favors a stay.

## IV.    CONCLUSION

For the reasons we have explained, we **GRANT** the stay pending appeal. The district court order is **STAYED** to the extent it enjoins the government's use of the classified documents and requires the government to submit the classified documents to the special master for review.