[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13005

_____

DONALD J. TRUMP,

Plaintiff-Appellee,

*versus*

UNITED STATES OF AMERICA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:22-cv-81294-AMC

_____

Before WILLIAM PRYOR, Chief Judge, GRANT, and BRASHER, Circuit Judges.

PER CURIAM:

This appeal requires us to consider whether the district court had jurisdiction to block the United States from using lawfully seized records in a criminal investigation. The answer is no.

Former President Donald J. Trump brought a civil action seeking an injunction against the government after it executed a search warrant at his Mar-a-Lago residence. He argues that a court-mandated special master review process is necessary because the government's Privilege Review Team protocols were inadequate, because various seized documents are protected by executive or attorney-client privilege, because he could have declassified documents or designated them as personal rather than presidential records, and—if all that fails—because the government's appeal was procedurally deficient. The government disagrees with each contention.

These disputes ignore one fundamental question—whether the district court had the power to hear the case. After all: "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted).

This case was such an expansion. Exercises of equitable jurisdiction—which the district court invoked here—should be "exceptional" and "anomalous." *Hunsucker v. Phinney*, 497 F.2d 29, 32 (5th Cir. 1974).[1]  Our precedents have limited this jurisdiction with a four-factor test. *Richey v. Smith*, 515 F.2d 1239, 1243–44 (5th Cir. 1975). Plaintiff's jurisdictional arguments fail all four factors.

In considering these arguments, we are faced with a choice: apply our usual test; drastically expand the availability of equitable jurisdiction for every subject of a search warrant; or carve out an unprecedented exception in our law for former presidents. We choose the first option. So the case must be dismissed.

## I.

As Plaintiff's presidential term drew to a close in January 2021, movers transferred documents from the White House to his personal residence, a South Florida resort and club known as Mar-a-Lago.  Over the course of that year and into the next, and consistent with its responsibilities under the Presidential Records Act, 44 U.S.C. §§ 2201–2209, the National Archives and Records Administration sought to obtain missing presidential records that its officials believed were in Plaintiff's possession.

---

[1] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all published cases of the former Fifth Circuit decided prior to the close of business on September 30, 1981).

The government first sought the voluntary return of the records.  In January 2022, after months of discussions, Plaintiff transferred fifteen boxes of documents to the National Archives. Inside were "newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records, and a lot of classified records."  Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize ¶ 24, *In re Sealed Search Warrant*, No. 22-mj-08332 (S.D. Fla. Sept. 9, 2022) ("Warrant Affidavit") (quotation omitted).

The Department of Justice was alerted about the classified materials in February 2022.  *Id.*  It then sought access to the fifteen boxes so that the "FBI and others in the Intelligence Community" could examine them to assess "important national security interests," including "the potential damage resulting from the apparent manner in which these materials were stored."  The National Archives later advised Plaintiff that it planned to provide the FBI access to the records in roughly one week.  When he requested a delay of up to eleven days, the National Archives agreed.

When the new deadline arrived in April 2022, Plaintiff requested yet another extension.  He also informed the National Archives that if it declined to grant it, he would make a "protective assertion of executive privilege" over the documents.  The National Archives rejected that assertion as unviable—saying the "question in this case is not a close one"—and informed Plaintiff's

representatives that it would give the FBI access to the records. Plaintiff did not follow through with any effort to block the FBI's review of the documents. So the FBI reviewed the records in mid-May, more than three months after it first learned that classified documents had been stored at Mar-a-Lago. It found 184 documents marked at varying levels of classification, including twenty-five marked top secret. Warrant Affidavit ¶ 47.

In the meantime, the FBI had developed evidence that even more classified information likely remained at Plaintiff's residence. The Department of Justice obtained a grand-jury subpoena for all documents or writings bearing classification markings that were in Plaintiff's custody or control, and Plaintiff's counsel was served with the subpoena in early May.

Plaintiff did not assert claims of privilege or declassification in response to the subpoena. But he did seek more time to produce the requested documents, and the government eventually extended the compliance deadline to June 7, 2022. A few days before the deadline was set to expire, Plaintiff's representatives produced an envelope wrapped in tape, which was consistent with an effort to comply with handling procedures for classified documents. Warrant Affidavit ¶¶ 58, 60. It contained thirty-eight classified documents, seventeen of which were marked top secret. *Id.* A declaration accompanying the documents certified that a "diligent search was conducted" of the boxes moved from the White House and that "[a]ny and all responsive documents" had now been produced.

Even so, the FBI developed more evidence that other classified documents remained at Mar-a-Lago. In August 2022—over one-and-a-half years after the end of Plaintiff's presidential administration, six months after the first transfer of boxes to the National Archives, and three months after the subpoena was served—the Department of Justice sought a search warrant. It presented an FBI agent's sworn affidavit to a Florida magistrate judge, who agreed that probable cause existed to believe that evidence of criminal violations would likely be found at Mar-a-Lago. Warrant Affidavit at 1, 32; Notice of Filing of Redacted Documents at 2, *In re Sealed Search Warrant*, No. 22-mj-08332 (S.D. Fla. Aug. 11, 2022) ("Search Warrant"). The magistrate judge issued a search warrant for the offices, storage rooms, and potential storage sites at Plaintiff's residence, and authorized the seizure of:

> All physical documents and records constituting evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793, 2071, or 1519, including the following:
>
> a. Any physical documents with classification markings, along with any containers/boxes (including any other contents) in which such documents are located, as well as any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes;

b. Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

c. Any government and/or Presidential Records created between January 20, 2017, and January 20, 2021; or

d. Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential Records, or of any documents with classification markings.

Search Warrant at 4. The warrant affidavit described a set of protocols proposed by the government to create a "Privilege Review Team." Warrant Affidavit ¶ 81. The team was made up of agents who were not otherwise participating in the investigation; they were tasked with reviewing certain seized documents to protect Plaintiff's attorney-client privilege. *See id.* ¶¶ 81–84.

The FBI executed the search warrant on August 8. Agents seized approximately 13,000 documents and a number of other items, totaling more than 22,000 pages of material. Despite the certification from Plaintiff that "[a]ny and all" documents bearing classification markings had been produced, fifteen of the thirty-three seized boxes, containers, or groups of papers contained documents with classification markings, including three such documents found in desks in Plaintiff's office. All told, the search uncovered over one hundred documents marked confidential, secret, or top secret.

Plaintiff requested a copy of the warrant affidavit, an opportunity to inspect the seized property, a detailed list of what was taken from the residence and where it was found, and consent to the appointment of a special master "to protect the integrity of privileged documents." The government denied those requests shortly after the search.

A few weeks later, Plaintiff filed a new action in the United States District Court for the Southern District of Florida, which he styled as a "Motion For Judicial Oversight And Additional Relief." The motion asked the court to (1) appoint a special master; (2) enjoin review of the seized materials until a special master was appointed; (3) require the United States to supply a more detailed list of the items seized; and (4) order the United States to return any item seized that was not within the scope of the search warrant. The motion was a civil filing and did not explain how the district court had jurisdiction to act on all of its requests. It did, however, claim to be a precursor to an eventual motion under Federal Rule of Criminal Procedure 41(g). That rule permits a "person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to "move for the property's return." Fed. R. Crim. P. 41(g).

The district court could not identify a sufficient jurisdictional basis for the filing, so it requested a jurisdictional brief. Days later, Plaintiff responded that the district court had "equitable and ancillary jurisdiction," as well as "anomalous jurisdiction," to enjoin the government and appoint a special

master.  He also suggested that Federal Rule of Civil Procedure 53 may create an independent cause of action to appoint a special master, but cited no authority for that theory.  As for the requested injunction against the United States, Plaintiff noted that the "law's ambiguity" meant that "principles of fairness" supported exercising jurisdiction over the entire motion.

The next day—August 27—the district court issued an order declaring "its preliminary intent to appoint a special master" and requiring the government to provide Plaintiff with a more detailed list of seized items.  The court stated that it had jurisdiction pursuant to the court's "inherent authority" and Federal Rule of Civil Procedure 53(b)(1), which reads: "Before appointing a master, the court must give the parties notice and an opportunity to be heard.  Any party may suggest candidates for appointment."

After a response from the government that included a description of its privilege filter process, the district court issued a September 5 order directing the appointment of a special master under soon-to-be developed procedures, and barring the government from using any of the seized documents "pending resolution of the special master's review process."  The order was issued "[p]ursuant to the Court's equitable jurisdiction and inherent supervisory authority."

Three days later, the government filed a notice of appeal.  It also filed a motion for a partial stay of the injunction so that it could continue using the seized documents bearing classification markings in its criminal investigation.  The district court rejected

the partial stay on September 15.  It also issued an order naming the special master and setting out his specific duties.

The government sought a partial stay from this Court the next day.  We granted the stay, concluding that the district court likely had no equitable jurisdiction to issue an order relating to the classified documents.  *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *1, *7 (11th Cir. Sept. 21, 2022).  Plaintiff applied for relief in the Supreme Court, but that request was denied.  *Trump v. United States*, No. 22A283, 2022 WL 7255980, at *1 (U.S. Oct. 13, 2022).

On October 5, this Court approved the government's request for expedited briefing in its appeal of the September 5 order blocking review of the seized documents and directing the appointment of a special master.  Now, with the benefit of oral argument, we conclude that the district court lacked jurisdiction to consider Plaintiff's initial motion or to issue any orders in response to it.

## II.

Because federal courts lack general jurisdiction, it "is to be presumed that a cause lies outside" of our "limited jurisdiction." *Kokkonen*, 511 U.S. at 377.  The "burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* We review an exercise of equitable jurisdiction for abuse of discretion. *See Richey*, 515 F.2d at 1243.  And review of a preliminary

injunction includes the power to dismiss the entire action based on jurisdiction or the merits. *Munaf v. Geren*, 553 U.S. 674, 691 (2008).

## III.

Only the narrowest of circumstances permit a district court to invoke equitable jurisdiction. Such decisions "must be exercised with caution and restraint," as equitable jurisdiction is appropriate only in "exceptional cases where equity demands intervention." *In re $67,470*, 901 F.2d 1540, 1544 (11th Cir. 1990); *see also Hunsucker*, 497 F.2d at 32. This is not one of them.

"It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions." *Douglas v. City of Jeannette*, 319 U.S. 157, 163 (1943). To avoid unnecessary interference with the executive branch's criminal enforcement authority—while also offering relief in rare instances where a gross constitutional violation would otherwise leave the subject of a search without recourse—this Circuit has developed an exacting test for exercising equitable jurisdiction over suits flowing from the seizure of property. *Richey v. Smith* instructs courts to consider four factors: (1) whether the government displayed a "callous disregard" for the plaintiff's constitutional rights; (2) "whether the plaintiff has an individual interest in and need for the material whose return he seeks"; (3) "whether the plaintiff would be irreparably injured by denial of the return of the property"; and (4) "whether the plaintiff has an adequate remedy at law for the redress of his grievance." 515 F.2d at 1243–44 (quotation omitted).

Plaintiff's jurisdictional brief in the district court dispatched with all four of these inquiries in a single paragraph. But *Richey*'s inquiry is not as simple as that filing made it out to be.

When we examine Plaintiff's arguments about the *Richey* factors, we notice a recurring theme. He makes arguments that— if consistently applied—would allow any subject of a search warrant to invoke a federal court's equitable jurisdiction. That understanding of *Richey* would make equitable jurisdiction not extraordinary, "but instead quite ordinary." *United States v. Search of Law Office, Residence, and Storage Unit Alan Brown*, 341 F.3d 404, 415 (5th Cir. 2003) (quotation omitted). Our precedents consistently reject this approach. We have emphasized again and again that equitable jurisdiction exists only in response to the most callous disregard of constitutional rights, and even then only if other factors make it clear that judicial oversight is absolutely necessary.

## A.

We begin with whether Plaintiff has shown a "callous disregard" for his constitutional rights. Whether that sort of violation has occurred is the "foremost consideration" for a court when deciding whether it may exercise its equitable jurisdiction in this context. *United States v. Chapman*, 559 F.2d 402, 406 (5th Cir. 1977). When considering this factor, our precedent emphasizes the "indispensability of an 'accurate allegation' of 'callous disregard.'" *Id.* (quoting *Richey*, 515 F.2d at 1243) (alteration adopted); *see also Hunsucker*, 497 F.2d at 34 n.10 (collecting cases). Absent that,

courts will not intervene in an ongoing investigation—and rightly so. Because the vast majority of subjects of a search warrant have not experienced a "callous disregard" of their constitutional rights, this factor ensures that equitable jurisdiction remains extraordinary. Otherwise, "a flood of disruptive civil litigation" would surely follow. *Deaver v. Seymour*, 822 F.2d 66, 71 (D.C. Cir. 1987). This restraint guards against needless judicial intrusion into the course of criminal investigations—a sphere of power committed to the executive branch.

The callous disregard standard has not been met here, and no one argues otherwise. The district court's entire reasoning about this factor was that it "agrees with the Government that, at least based on the record to date, there has not been a compelling showing of callous disregard for Plaintiff's constitutional rights." None of Plaintiff's filings here or in the district court contest this finding.

Instead, he says callous disregard of his constitutional rights is not indispensable to *Richey*'s test. That is an incorrect reading of our precedent, as well as inconsistent with the longstanding principles outlined above. *Chapman*, 559 F.2d at 406. And the fact that *Richey* considers three other factors in its test does not suggest otherwise. To the contrary, these factors underscore how rare this exercise of jurisdiction should be—even a callous disregard of constitutional rights is not enough, on its own, to allow for the type

of relief that Plaintiff seeks.[2]   As we did in *Chapman*, we will consider the remaining factors for the sake of completeness.

## B.

The second *Richey* factor is "whether the plaintiff has an individual interest in and need for the material whose return he seeks."   515 F.2d at 1243.   Plaintiff's jurisdictional brief mischaracterized this standard, referring to "the *parties'* need for the seized material" (emphasis added).   He is wrong to suggest that jurisdiction somehow depends on the balance of interests between the parties—the relevant inquiry is if *he* needs the documents.

Plaintiff has made no such showing.   His jurisdictional brief in the district court asserted that the government had improperly seized his passports and that its continued custody of "similar materials" was "both unnecessary and likely to cause significant harm."   But the passports had already been returned before he filed his first motion, and his jurisdictional brief did not explain what "similar materials" were at issue or why he needed them.

The district court was undeterred by this lack of information.   It said that "based on the volume and nature of the seized material, the Court is satisfied that Plaintiff has an interest in and need for at least a portion of it," though it cited only the

---

[2] Plaintiff's lawyers claimed at oral argument that the special master process is necessary to determine whether a constitutional violation happened.   This justification finds no support in our precedent and would result in a dramatic and unwarranted expansion of equitable jurisdiction.

government's filings and not Plaintiff's.  But that is not enough.
Courts that have authorized equitable jurisdiction have
emphasized the importance of identifying "specific" documents
and explaining the harm from their "seizure and retention."  *See,*
*e.g., Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593, 600
(5th Cir. 2021) (Harbor did "far more than assert vague allegations"
by pointing to "thousands" of privileged documents that the
government retained for four years).  Neither the district court nor
Plaintiff has offered such specifics.

Indeed, Plaintiff does not press the district court's theory on
appeal.  Instead, he argues that the Presidential Records Act gives
him a possessory interest in the seized documents.  This argument
is unresponsive.  Even if Plaintiff's statutory interpretation were
correct (a proposition that we neither consider nor endorse),
personal interest in or ownership of a seized document is not
synonymous with the need for its return.[3]  In most search warrants,
the government seizes property that unambiguously belongs to the
subject of a search.  That cannot be enough to support equitable
jurisdiction.

---

[3] During discussion of this factor at oral argument, Plaintiff's counsel noted
that the seized items included "golf shirts" and "pictures of Celine Dion."  The
government concedes that Plaintiff "may have a property interest in his per-
sonal effects."  While Plaintiff may have an interest in these items and others
like them, we do not see the need for their immediate return after seizure un-
der a presumptively lawful search warrant.

Having failed to show his own need, Plaintiff attempts—as he did in the district court—to reverse the standard, arguing that the government does not need the non-classified documents for its investigation. This is not self-evident, but it would be irrelevant in any event. Plaintiff's task was to show why *he* needed the documents, not why the government did not. He has failed to meet his burden under this factor.

## C.

*Richey* next asks "whether the plaintiff would be irreparably injured by denial of the return of the property." 515 F.2d at 1243. In his jurisdictional brief, Plaintiff suggested only that the government's "continued custody" of documents "similar" to his passport was "likely to cause significant harm." And again, the district court stepped in with its own reasoning. It identified potential irreparable harm that could arise based on (1) improper disclosure of "sensitive information" to the public; (2) the United States's retention and potential use of privileged materials; and (3) the stigma associated with the threat of future prosecution.

Plaintiff has adopted two of the district court's arguments, dedicating a single page of his brief to discussing the first and third theories of harm. On the first argument, Plaintiff echoes the district court and asserts that he faces an "unquantifiable potential harm by way of improper disclosure of sensitive information to the public." It is not clear whether Plaintiff and the district court mean classified information or information that is sensitive to Plaintiff personally. If the former, permitting the United States to review

classified documents does not suggest that they will be released. Any official who makes an improper disclosure of classified material risks her own criminal liability. *See, e.g.,* 18 U.S.C. § 798. What's more, any leak of classified material would be properly characterized as a harm to the United States and its citizens—not as a personal injury to Plaintiff.

As for records that may otherwise be "sensitive," it cannot be that prosecutors reading unprivileged documents seized pursuant to a lawful warrant constitutes an irreparable injury for purposes of asserting equitable jurisdiction. Here too, Plaintiff's argument would apply to nearly every subject of a search warrant. The district court's unsupported conclusion that government possession of seized evidence creates an "unquantifiable" risk of public disclosure is not enough to show that Plaintiff faces irreparable harm.

Similar reasoning guides our approach to the other potential injury identified by Plaintiff: the threat and stigma of future criminal prosecution. No doubt the threat of prosecution can weigh heavily on the mind of anyone under investigation. *See Richey*, 515 F.2d at 1243 n.10; *see also Deaver*, 822 F.2d at 70. But without diminishing the seriousness of the burden, that ordinary experience cannot support extraordinary jurisdiction. *Alan Brown*, 341 F.3d at 415; *see also Cobbledick v. United States*, 309 U.S. 323, 325 (1940). The third *Richey* factor also weighs against exercising equitable jurisdiction.

## D.

Finally, *Richey* asks "whether the plaintiff has an adequate remedy at law for the redress of his grievance." 515 F.2d at 1243–44. In deciding this factor for Plaintiff, the district court's answer was that he "would have no legal means of seeking the return of his property for the time being and no knowledge of when other relief might become available." This is not a sufficient justification. To start, Plaintiff invokes Rule 41(g) in his brief on appeal, but only to say that it has been applied in other cases. The only argument that he has plausibly made relating to that rule is for the return of documents "not within the scope of the Search Warrant." There is no record evidence that the government exceeded the scope of the warrant—which, it bears repeating, was authorized by a magistrate judge's finding of probable cause. And yet again, Plaintiff's argument would apply universally; presumably any subject of a search warrant would like all of his property back before the government has a chance to use it.

Plaintiff's alternative framing of his grievance is that he needs a special master and an injunction to protect documents that he designated as personal under the Presidential Records Act. But as we have said, the status of a document as personal or presidential does not alter the authority of the government to seize it under a warrant supported by probable cause; search warrants authorize the seizure of personal records as a matter of course. The Department of Justice has the documents because they were seized with a search warrant, not because of their status under the

Presidential Records Act.  So Plaintiff's suggestion that "whether the Government is entitled to retain some or all the seized documents has not been determined by any court" is incorrect. The magistrate judge decided that issue when approving the warrant.  To the extent that the categorization of these documents has legal relevance in future proceedings, the issue can be raised at that time.

All these arguments are a sideshow.  The real question that guides our analysis is this—adequate remedy *for what?*  The answer is the same as it was in *Chapman*: "No weight can be assigned to this factor because [Plaintiff] did not assert that any rights had been violated, *i.e.*, that there has been a callous disregard for his constitutional rights or that a substantial interest in property is jeopardized."  559 F.2d at 407.  If there has been no constitutional violation—much less a serious one—then there is no harm to be remediated in the first place.  This factor also weighs against exercising equitable jurisdiction.

## IV.

None of the *Richey* factors favor exercising equitable jurisdiction over this case.  Plaintiff, however, asks us to refashion our analysis in a way that, if consistently applied, would make equitable jurisdiction available for every subject of every search warrant.  He asks us to ignore our precedents finding that a callous disregard for constitutional rights is indispensable.  He asks us to conclude that a property interest in a seized item is a sufficient "need" for its immediate return.  He asks us to treat any stigma

arising from the government's access to sensitive personal information or the threat of potential prosecution as irreparable injuries. And he asks us to find that he has no other remedy apart from equitable jurisdiction, even though he faces no remediable harm. Anyone could make these arguments. And accepting them would upend *Richey*, requiring federal courts to oversee routine criminal investigations beyond their constitutionally ascribed role of approving a search warrant based on a showing of probable cause. Our precedents do not allow this, and neither does our constitutional structure.

Only one possible justification for equitable jurisdiction remains: that Plaintiff is a former President of the United States. It is indeed extraordinary for a warrant to be executed at the home of a former president—but not in a way that affects our legal analysis or otherwise gives the judiciary license to interfere in an ongoing investigation. The *Richey* test has been in place for nearly fifty years; its limits apply no matter who the government is investigating. To create a special exception here would defy our Nation's foundational principle that our law applies "to all, without regard to numbers, wealth, or rank." *State of Georgia v. Brailsford*, 3 U.S. (3 Dall.) 1, 4 (1794).

\*        \*        \*

The law is clear. We cannot write a rule that allows any subject of a search warrant to block government investigations after the execution of the warrant. Nor can we write a rule that allows only former presidents to do so. Either approach would be

a radical reordering of our caselaw limiting the federal courts' involvement in criminal investigations. And both would violate bedrock separation-of-powers limitations. Accordingly, we agree with the government that the district court improperly exercised equitable jurisdiction, and that dismissal of the entire proceeding is required.

The district court improperly exercised equitable jurisdiction in this case. For that reason, we **VACATE** the September 5 order on appeal and **REMAND** with instructions for the district court to **DISMISS** the underlying civil action.